143101 Archuleta v. Miller Ms. Miller didn't meet those qualifications, did she? Yes, she did, John. She had a doctorate? What was it, advanced degree? What did the records call for? I don't recall that she needed the doctorate. No, she needed qualifications she didn't have. Well, if you want to argue with me on that, I'll find the specifics. You go ahead and I'll find it for you. Well, let me ask you a more global question, which is what is the government's view as to how the board erred here? The board erred in two fundamental ways. One, it conflated its consideration of the reassignment itself, which is a non-appealable action not subject to board review for the efficiency of the service. Well, I don't know. Is that the government's view? I mean, there's several alternatives going on here. I mean, as I read it, and the board can tell me if I'm reading it wrong, they first said this wasn't necessary. And then in reconsideration, they seem to have backed away from the necessary standard and moved towards at least using the words legitimate or bona fide. Is it your view that that's the correct standard? At least you may quibble over how they applied it. But is there a standard that the agency does have to establish that it was a bona fide or a legitimate reassignment? Yes. As a general proposition, any management directive, geographical relocation, whatever, any management directive should be, at least on its face, lawful. Okay, and your view is that the board gets to review that? No. Well, it gets to decide, gets to at least examine whether it was lawful, and in the case of a reassignment, whether it was made in good faith for legitimate management reasons. So your dispute with the board here is that notwithstanding that they said that they were using the standard the second time around, that indeed, if you examine the facts and the criteria they used, they went beyond that, right? Yes, ma'am. How does that part of it, the efficiency of the service, move into what you think the correct criteria is? I think in Frey, we did use the term the efficiency of the service in connection with legitimacy. The court did, and I will say that in a variety of board decisions and decisions from this court, there's language to the effect of sometimes it just says a bona fide legitimate managerial discretion exercise and just stops. Sometimes it says to promote the efficiency of the service, in the interest of the service, for the good of the service, and indeed, in the record here when the managers, Mr. Knox and Ms. Massacre, talk about their management decision to reassign. They talk about that they believe this reassignment would be good for the service, that it would promote the mission of the agency in Alaska, which is, of course, a fundamental managerial responsibility is to use your personnel, their talent, skills, and experience where you think. So what do you want us to do? We review for substantial evidence. So even though the board, at least in reconsideration, applies, in name at least, the standard that you're saying is the correct standard, then what are we to do to say that even though they applied the correct standard, if we review the facts ourselves, we conclude that there was not sufficient evidence? What do you want us to do? You touched on it before. They state the standard. They misapply the standard. The only adverse action that's before the board for review for efficiency of the service is the removal. There's long-standing case law. Fry was mentioned. There's others at both the board and this court that recognizes that when an employee refuses to follow management directives… No, but even you're not coming here saying that that's the extent of their review and they can't look at the underlying action at all. But they look at the underlying action only to determine whether it was made in good faith for legitimate management reasons. They do not look at it for the wisdom of it, whether they got it right or wrong. So let me apologize to you, Mr. Blades. I put doctor on my mind because what the requirement was as they expanded the position was that the person had to have carried out groundbreaking work in this area. I shortened that to a doctor. But she did. Ms. Miller, your witness Stewart testified that Ms. Miller had never carried out any such groundbreaking work. I would say the – and to dovetail with Judge Crow's question, I really – It does dovetail because I think it screams pretext. Right, and although I – although the board's decision is not supported by substantial evidence, what we think is fundamentally wrong is the board's application of the standard. But as to the evidence, the administrative judge considered all of the evidence, made credibility determinations, and determined, among other things, that Ms. Miller was qualified for the position. She heard the administrative judge. She heard the testimony of the experts. She heard the testimony of everyone else. Ms. Miller, at the time that the position was first presented, apparently considered herself qualified for the position. She offered to do it long distance. She offered to do it long distance. She even tried to see if she could get it upgraded to a GS-14. So – and to the extent that's a factual question, whether she was qualified, that was resolved by the administrative judge. And the board itself, with regard to that and the other factual findings of the administrative judge, did not make any contrary findings or explain any contrary findings. And back to Judge Croak's question, the board essentially didn't do any analysis based on what the facts in the record were. They went through the process of stating the standards and then just reaching the conclusion that the reassignment was not bona fide or for legitimate management reasons, where the record is full of evidence as to the good faith of the managers and the reasons for why they were making the reassignment. The board otherwise acknowledges that the agency had a good reason for creating the position in Anchorage and for believing that Ms. Miller was well-suited to accept the position. But nevertheless, the board simply concludes, as I say, without any real analysis, just citing the standards and then says that because essentially they think it wasn't a good idea to ask Ms. Miller to take the position and that once she refused, the agency then had to fill two vacant positions, that it couldn't have been bona fide or for legitimate management reasons. Why don't we stay and review the rebuttal while we store a couple minutes and we'll get to the other side. Thank you. Good morning and may it please the court. The board simply… The board doesn't have to follow Fry, right? The board does have to follow Fry and Fry says at the bottom of page 1357, where a removal action is based on a refusal to accept a directed geographical reassignment. The agency must prove by a preponderance of the evidence that its reassignment decision was bona fide and based upon legitimate management considerations in the interest of the service. So here's the board's simple point is… You're representing the board? Yes. Mr. Garger, right? That's correct. But what about we said at 1360, Mr. Garger, we quoted, we discussed Ketterer at length and we said we endorsed the board's approach in these cases as set forth above and adopted as the law of the circuit. And that means we specifically said, I remember the case, I remember it being argued to us, this is a good approach. So we looked at the case, we agreed, and we said we adopt that as the law of the circuit. Now once it's the law of the circuit, the board can't back off from it or change it. We can do that in bank or the Supreme Court can do it to us. And the one thing I would disagree with, there's references in the board opinion to us deferring to the board in Ketterer, in Fry. We didn't defer. We said you've got a good approach here. It's now the law of the circuit. So let's go back to the two-step approach. That's what controls here. The board can't change that as Mr. Blades came around and agreed. Do you agree that the board can't overrule us? The board's view, and you're correct, it's at the bottom of the appendix, page 13, is citing Tunick, that where an agency interpretation is found to be reasonable, then another panel can actually change it. But who's the other panel here? The board? No, it would be this court. But we, yeah, that's right. It's not found by the earlier, as far, and to be clear, what we're talking about is the burden of production. But we said we approve and adopt as the law of the circuit the burden of production approach that was stated in Ketterer. So that means it's the law now, okay? So the board has to follow the two-step approach that we laid out in Fry when we followed Ketterer. Even if that was an error, I believe it would be a harmless error here because the burden of production… How is it harmless when the board purports to overrule us? It seems like a pretty big thing. Right. Even as Fry makes clear, and I read that section, the burden of proof always remains on the agency. Yeah, but you have to go through a two-step approach, and it becomes a very different case when you do that here. Because the AJ found, number one, that Mr. Knox was credible and that there was a legitimate reason for the removal, point one. Point two, he found that – or she found, I'm sorry, it was Judge Bunnell-Taylor. She found that Ms. Miller was qualified for the position and she found her not credible on certain points. And finally, she rejected the various affirmative defenses. Now the board, in the footnote, the first opinion, 15 to 513 opinion, doesn't change any of that. It doesn't disturb the finding that it was a legitimate management reason, and it doesn't disturb the finding that she was qualified, and it specifically says we agree with the AJ on the affirmative defenses. So there, under the two-step Ketterer approach, which controls, we agree now, the board has – the government has made out a prima facie case, and it's the other side's burden to come in and show different things, and it didn't. And the board puts in these things about, you know, there wasn't a vacancy in the position. None of that's relevant. Even if Ketterer – the burden of production was applied here, we'd end up with the same result because there needs to be – How you can't get around the findings. There's no challenge here to the findings, the credibility determinations of the AJ. No one has said the AJ failed to follow the proper Hillen approach. The problem with the agency testimony isn't that it lacks credibility. It's that it's conclusory. Can I take you a step back, looking at the evidence? I'm not clear on how things went down here. The board initially – am I – I'm saying this, and I want you to tell me whether I'm right or wrong. The board initially uses the standard of it wasn't necessary, repeatedly, in its opinion. And then it comes in for reconsideration. Does the board kind of get told and appreciate that necessary is the wrong standard, so we've got to change that, and we've got to apply a legitimate standard? Is that a fair assessment of what went on here? Not in terms of burden of proof. I'm talking about whether you applied necessary, which the board repeatedly applied initially, or whether the standard is legitimate. So OPM came in at the board level, asked for reconsideration at the board level, and argued that necessary was the incorrect language. Right. And the board basically agreed that the correct language is out of the statute. So the board agreed that its initial analysis was incorrect because it applied the wrong standard, the too high a standard of necessary versus legitimate, correct? Right. But they agreed the same result. Yeah, I know. And then they go back, and I'm not seeing – except for the words, it's just hard for me – they repeat a lot. And so in their reconsideration, they repeat a lot about what they said before about necessary, using necessary again. And then they cite a few cases, and they talk about burden shifting. And so where would you say is the board – the chunk of the board's analysis as to why this was not a legitimate board action? Is it at page 11, where they start? Well, as the board says, I would point to both page 7 in the reconsideration decision and probably in the first decision, 30 to 31. But page 7. Okay. Where is that in the appendix, Mr. Dunn? Appendix at page 7. Sorry. No, it's okay. And this is the – just so the record will be clear, this is December 6, 2013. Exactly. In sum, the agency failed to present any evidence showing that its reasons for directing – I'm on page 7, but I'm not seeing what you're reading. It's the paragraph 11. It's marked as paragraph 11. It begins, the board ended discussion, however, stating that in sum, the agency failed to present any evidence showing that its reasons for directing the appellate geographic reassignment to Anchorage was bona fide. It goes on from there. And then it says the emphasis in this case has always been on the agency's failure to show that its reasons for the reassignment were bona fide and that its action promoted the efficiency of the service. So the problem in this case isn't the witness testimony, which was conclusory. They just say she's the best person. The problem with this case is if you look at the actual position description, the position they're trying to put her in, and you look at the requirements, okay, and then going back to Fry or Fray where the court says this has to be a legitimate management reason. Well, the board can only sustain an agency action based on the reason provided by the agency. It can't come – sustain it on some other reason, some alternative reason. It has to be the reason provided by the agency. But the agency found it was legitimate – that legitimate reasons had been established, and the board did not say that that fact-finding was wrong. So the reason that provided by the agency – But the board then comes in with all of these things about, you know, her position wasn't being eliminated. She had good performance reviews and all of this, and a whole bunch of things. And then says – said this was a veiled removal. This was a veil for removal action. There's no basis for that. In terms of the findings that were found, it's contrary to what the AJ found, and the board did not say we reject the AJ's findings. It just went off and brought in a whole lot of other things. The problem here is not evidence. It's the absence of evidence. So the reason given by the Park Service for this reassignment was she's uniquely qualified for this position. She's the only person who meets all the requirements of the position. And you look at the requirements on page 169 to 170 of the position description. Requirements for this position. Expert knowledge of federal laws and regulations. Alaska Indian law at a mastery level. Expert knowledge at a mastery level. Cultural traditions and sacred beliefs of the tribes. Extremely sensitive to – Do they have to prove that this was the only person in the whole government that was qualified for the position in order to effectuate a reassignment based on legitimate reasons? They have to prove the reason they give. And the reason they gave was that she was the only one who met all the needs of the position. Now, if that was the reason they gave, that's what they have to prove. Just before your time runs out, something that would disturb me, and maybe I'm just missing something about what cases say that I'm not familiar with. It seemed to me that the board didn't rely exclusively but relied heavily on the fact that this was a valuable and successful employee, and her leaving created two vacancies. Is that a fair statement? That is, yes. Are there other cases that rely on that? My concern with that is, firstly, it's a temporal thing because you don't know that in most cases. But, you know, the government fired 15,000 air traffic controllers. It created an absolute mess in the flying skies of America. And I don't recall anybody ever using a factor, well, my God, we've created 15,000 vacancies by flying these people. I've just never seen it used. By definition, any time you fire someone, you could fire 10 people for misconduct and you could be at a higher increase so that it's impossible to ever even fill those positions in the foreseeable future. Is the board going to use as a criteria that it didn't promote the efficiency of the service because now you've got vacancies and you can't fill them? No. To be clear, successful employees are reassigned all the time. And the most common, most typical type of reassignment is a reorganization or restructuring or reduction enforced by an agency to make itself more efficient. Sure, and if this woman had accepted the job, then there wouldn't be a vacancy. But because she refused to accept the job, the agency removed her, right? And the board doesn't deny that agencies are allowed to do that as long as the reassignment was for a legitimate reason, right? Right. So in every case where somebody is reassigned, doesn't want to take the reassignment, and then leaves, is there going to be a thumb on the scale that this is a factor that doesn't promote the efficiency of the service because we lost a good employee, a decent employee, and now we've got two vacancies? No, not at all. Again, this happens frequently that you have reassignments as part of a reduction enforced or restructuring. So to what extent the board repeatedly referred to this as a criteria? Am I wrong about that, that the board relied on this? What the board is trying to point out is how unusual this case actually is. You have someone singled out and at the hearing just prays for her about how wonderful she's doing as a park superintendent. And she's the only one here being reassigned. Even in Pride, there were, I think, four other people being reassigned. It wasn't just Frey being singled out for this. And she's doing really great in the position, and they want her to put her in another position, but there's no evidence showing that she meets the qualifications or she's uniquely qualified to use the reason provided by the Park Service. Well, she's unqualified according to their own standards. Right. She doesn't meet the requirements listed here. But in any event, the reason provided was she's uniquely qualified, which is something somewhere above minimally qualified. So it doesn't make sense, and it's hard to see how to promote the efficiency of a service. To take someone who's doing so well in their current position, take them out of that, create a vacancy, put them in another position where we don't know how she'll perform based on the record, which doesn't show she's qualified. So that's what I think the board is trying to show how unusual this case is. If you look at other cases, Frey is a good example. Frey was not performing well in his position. And so the organization that he was a part of was trying to make itself more efficient by moving people around. The board, I think it was in the 513 decision, uses the term, this reassignment was a veil for a removal. Do you recall that? That's a very sinister characterization. This woman had a good record there. There's no indication of bad relations with Mr. Knox. As has been pointed out, she was successful. There's no indications of friction or tension. But why is this sinister, hostile implication brought in with no factual basis for it? She didn't even testify that she'd been harassed or anything. Well, there's circumstantial evidence that this was a veil to effect an adverse action. Specifically, the creative position at the GS-13 level, her level, came back and the classifier said this is in 1512. But what's the evidence of any hostile – often in these cases we'll see some kind of a background of hostility, tension. That's not in the record here. And yet the board puts this sinister term in there. I don't think it was meant to be sinister. Wasn't there some evidence of her speaking out of turn in some fashion? There's evidence in both the proposal notice and the removal decision that there were tensions between her and her staff or that there was poor morale. All of that's forgotten when this case comes to the hearing. Suddenly she's the best superintendent ever, and you read it, and I quote big chunks of it in our brief. I'm going to have to go back through the record, but I recall that there appeared to be a reason for the creation of the position, a pretextual reason. That is that she did something that angered the people up in Anchorage. What was it? Well, there was – and Mr. Passman might have more on this – but there was a management review that happened right before this position was created. The Park Service, for whatever reason, did not put that in the record. So, I mean, that would be – that could have been a legitimate reason if she did have performance problems, but that's not what they're saying. They're saying she doesn't have performance problems. She has a high level of performance in her current position. She spoke out in some fashion. I'll let your co-counsel. Why don't we hear from Mr. Passman, and we're going to shrink your time to a couple minutes, Mr. Passman, because we'll be out. May it please the court. OPM is really objecting to the board's weighing of the evidence in regard to the reasons set forth by the agency for the directed assignment. Yet, OPM is conceding that the board must review the legitimacy of any supervisory order before sustaining discipline based upon the failure to obey the order. It is necessary for the board to review the rationale for the geographic reassignment here to determine whether the employer has shown that the reassignment had no solid or substantial basis in the personnel policy. Can you just address very briefly, because you've got very little time, but Judge Shaw's point about whether or not the board had the authority to overrule Frey? Well, I think that was better handled by the board representative, but I think still the bottom line is that the agency has the burden of proof similar to an adverse action by preponderance of the evidence. They didn't show that here. What we really have here is a disguised adverse action. Well, except we've got an AJ opinion that had lots of testimony that credited the testimony, and if you just take that as a given, and she had an opportunity to hear from the appellant as well, why isn't that sufficient to establish legitimacy? It isn't, because, for example, in these types of situations, when a new position is created, it's required that somebody from HR review the employee to determine whether she meets the minimum qualifications. That was never done here. There's no evidence in the record that was any… Were you representing this person at the hearing? I was. Did any of that come out at the hearing? You had an opportunity to cross-examine these individuals? Well, we didn't, because the agency never put on any HR witnesses. They only put on an individual who was from another agency who was not involved in the process of qualifying Ms. Miller. It only came out during discovery how the agency had engineered the position to be a GS-13, and it created it for reassignment. That's really unusual. When positions are created, they're created for recruitment. Then people apply. People can also apply for reassignment. But this position was specifically engineered for Ms. Miller, and when the classifier said the job wouldn't even barely classify as a 12, they raised the position then to a GS-13 by putting in all these very tough requirements that Ms. Miller couldn't meet. She was an engineer and manager. Let me ask you this. As I was asking your co-counsel, I seem to recall that there was an event which triggered this creation of this position, and that it was something that, at least you argue Ms. Miller did, that irritated the folks up in Anchorage. What was that? I know I saw it in there. It was a management review, as counsel has pointed out, is not part of the record, but it's referenced also in the meeting that Ms. Miller had when she learned about a reassignment, and it's also mentioned in the proposal in the decision letter. The management review basically claimed that Ms. Miller was having friction with staff at the park, and then she brought that up during that meeting on April 27th, but even there, she had no prior warning of any possible reassignment. Nobody had counseled her. All of a sudden, she brought in a meeting. Excuse me, I don't want to interrupt, but one question that I had, there's reference in here, and what is exactly a mobility agreement, and how does it work, and what is the significance in this case? The briefs on both sides were written like we knew what that was, but I didn't see an explanation of what exactly is that. Mobility agreement is in positions that are required to move around the country to get different experience. Typically, like SES positions have mobility agreements, often law enforcement. The employee says, I agree to move to Kansas City or Denver if I'm sent there. No, they agree to move as required by the agency to enhance their training and experience, and there's no such example here. Ms. Miller was brought in without any notice on April 27th, 2010, and told, we're going to offer you a voluntary reassignment to Anchorage, which is a long distance away. She said, I need some time to think about it. They said, we'll give you two hours. Two hours later, they come back in the afternoon, and Ms. Miller tells them she's not likely to accept the reassignment. She doesn't want it. And all of a sudden, they give her a letter then saying, you're directed to be reassigned to Anchorage, and if you don't accept it, you're going to be fired in 30 days. No indication about due process or anything. Now, later, the letter was withdrawn, but it shows the mindset that they already planned to remove Ms. Miller, and this is more of a disguised adverse action. She was never well-suited for the position. There's no evidence in the record, nor did the board ever find that she was well-suited for the position. But what about the AJ's findings? The AJ's findings were erroneous. She ignored all of the contrary documentary evidence. She didn't discuss any of the documentary evidence. But the board didn't disturb those findings. Well, the board found that Ms. Miller, they didn't go into any detail, and they could have done a lot more, but they found that Ms. Miller had submitted credible evidence to cast doubt on the agency's motivation in effecting her removal. And it's right in the board decision. Now, they could have gone further and said what the credible evidence was, but it's the very evidence that we're discussing here today, that she was not qualified for the position. Okay. Thank you. Now, we've gone way over, so if you need extra time, we can give it to you, but I'm not sure how many more questions there are. Thank you, Your Honor. Quick point. As we were talking about before, as a matter of law, once the agency has established that they, in good faith, for legitimate reasons, had made the reassignment position. Yeah, but we're talking here about all this evidence in the record that apparently, at least arguably, points in the opposite direction. And the only fact-finding that's been done has not been overturned by the board or explained that any contrary findings should be found, and that's the findings of the administrative judge that the agency did have legitimate management reasons for making the reassignment. There's been much made of the idea that the agency was saying, well, she's uniquely qualified. As was mentioned, that didn't mean that she was the only person in the entire world who could do this, and perhaps it was hyperbole on the part of the manager. But what they were stating, and their testimony reveals this, is that among the people within the Alaska region, they believed that she was the person who could best do this job. Now, there's been mention about the management review. The management review was kind of a typical periodic management assessment that looked at all of the parts throughout the Alaska region and basically said, how are we doing, where can we do better? And the review made some suggested improvements. The most you can take out of that is that Ms. Miller, just like everybody else, was not perfect. And Ms. Miller herself, and perhaps this is what Judge Wallach's been thinking of, Ms. Miller herself took some issue with the way the management review had been conducted. But in the decision sustaining her removal by Ms. Masica, she mentions the management review. She makes reference to some of the findings, and as was mentioned, the review itself is not actually in the record. But she also says that the sole reason she was being removed was because she refused to accept the directive reassignment. And otherwise, there really is no evidence that the agency, in advance of creating this position and deciding that Ms. Miller, among the current employees, would be best to fill it, had any other designs on taking any personnel action against Ms. Miller. They recognize that, as I mentioned, she might not have been perfect as a superintendent, but one of her obvious manifested skill sets was that she was good at developing relations, particularly with the local community and the tribes. And that's what this position was going to be all about, but it was going to be bigger than just at Sitka. It was going to be throughout the Alaska region and was created as a result of policy directive from the Secretary himself. And so there really is no evidence that it wasn't, in a good faith, legitimate reason to make the reassignment. There is no evidence that there was a pretext to make the reassignment. And the longstanding rule is that employees can be expected to follow management directive, including relocations. And if they don't, an appropriate penalty is removal. If I can add one last thing on the mobility agreement. Mobility agreements are... It's such an appropriate remedy that a letter was prepared in advance, before she was even offered the position, saying you're going to be removed if you don't give us a decision. The directive letter said, and I think this is fairly standard language. When management directs a reassignment, they will also inform the employee that a refusal to accept the direction of management will subject the employee to discipline up to and including removal. And that's part of giving the employee notice that this isn't really just happening. That is the norm to call someone in and say, congratulations, you're being reassigned to a better job. And by the way, here's a letter saying you'll be fired if you don't accept this. That's an interesting approach to personnel management, I must say. Well, Your Honor, with all due respect, I appreciate the idea that management wants to ask first to see if somebody's willing to go voluntarily. But if they really need the person or want the person, believe that they have good reason that this person will help the mission of the agency in this new assignment, management is prepared to direct the reassignment. They'll ask first. If they refuse, they'll direct the reassignment, which no one questions they have the ability to do. No one questions that an employee does not... Of course they do. The question is why they prepared that letter in advance, which by the way they later withdrew. I'm sorry, which by the way what? They later withdrew. Oh. I can't tell you. It's not in the record. I would presume they... Other aspects of the record indicate that they were trying to expeditiously fill this position. Perhaps they had been getting pressure from above that they'd already spent more than a year on it. They needed to get it filled. But honestly, I don't know, and I don't think there's anything in the record as to why when the time came they were moving so quickly. If I can address the mobility agreement as the last thing. Mobility agreement is a generic term for agreements, kind of self-explanatory, but I understand that completely, that will control the terms if someone is asked to move and someone is, of course, agreeing in advance that they may be asked to move. But the absence of the mobility agreement in no way restricts the employer from instructing someone to move. It's just that there are not predetermined terms as to what the movement will be. So with that, Your Honor, we respectfully request that the Court reverse the decision of the board. Thank you. We thank all counsel on the cases submitted. That concludes our proceedings for this morning. All rise. The Honorable Court has adjourned until tomorrow morning at 10 a.m.